IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| COY L. DANIELS, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. 1:22-cv-01048-DDD |
| | § | |
| NATIONAL CREDIT SYSTEMS, INC., | § | |
| and EQUIFAX INFORMATION SYSTEMS, | § | |
| LLC, | § | |
| | § | |
| *Defendants*. | § | |

## DEFENDANT NATIONAL CREDIT SYSTEMS, INC.'S
## MOTION FOR SUMMARY JUDGMENT

National Credit Systems, Inc. ("Defendant" or "NCS"), the only remaining defendant in the case, files its Motion for Summary Judgment, pursuant to FED. R. CIV. P. 56 and shows as follows:

## SUMMARY OF ARGUMENT

Plaintiff Coy L. Daniels ("Plaintiff" or "Daniels") filed this Fair Credit Reporting Act ("FCRA") and Fair Debt Collection Practices Act ("FDCPA") case regarding a debt arising from an apartment lease in his name, claiming that the debt resulted from identity theft. However, Daniels' own deposition testimony revealed that the apartment was not secured by an identity thief, but Daniels' son, Torie, who obtained the lease with Daniels' permission. Daniels admitted that he filled out the Lease Application with all of his contact and personal information and signed the Lease Application so that his son could secure the apartment. Only after the lease resulted in an outstanding debt two years later did Daniels seek to avoid the debt by perjuriously claiming identity theft.

1

Defendant NCS is a debt collector who also furnishes account information to consumer reporting agencies such as Experian, Trans Union, and Equifax (the "CRAs"). PRCP-Aurora, LLC d/b/a Glen at the Park Apartments managed by Priderock (collectively the "Original Creditor") hired NCS to collect the subject debt allegedly owed by Daniels, and provided NCS with the Daniels' Lease Application, Apartment Lease Contract, and Move Out Statement in support of the debt (the "Account" or the "Debt"). Daniels makes no allegation that the amount of the Debt is inaccurate, only that he is not responsible for the Debt because he did not sign the Lease and that it resulted from identity theft.

Daniels' initial disputes of the debt, all based on identity theft, provided no documents in support, only his conclusory statement that the Debt did not belong to him. At NCS's repeated requests, Daniels finally provided a police report and identity theft affidavit. However, that police report, handwritten and signed by Daniels, was completed in the same handwriting, same signature, same personal identifiers and contact information as the Lease Application. In such a situation, it is beyond reasonable that NCS would continue to verify the Debt as valid, while marking it as disputed by Daniels.

Given this set of facts, Daniels' claims not only lack merit and must be denied, this is a situation—at least after Daniels' deposition testimony—that warrants a finding a bad faith or harassment and award of attorneys' fees to NCS pursuant to 15 U.S.C. § 1692k(a)(3).

## SUMMARY JUDGMENT EVIDENCE

Attached to this Motion are true and correct copies of the following items as identified below and incorporated by reference:

Exhibit "A":   Declaration of Ron Sapp

    Exhibit "A-1":     NCS Account Notes for Coy Daniels;

Exhibit "A-2":    ACDV information for all ACDVs NCS received on Plaintiff's account;

Exhibit "A-3":    Application for Residency (the "Lease Application");

Exhibit "A-4":    Apartment Lease Contract (the "Lease");

Exhibit "A-5":    Move-Out Statement;

Exhibit "A-6":    February 7, 2022 letter from Plaintiff with attached Identity Theft Affidavit and Police Report.

Exhibit "B":    Transcript of Deposition of Coy Daniels.

## STATEMENT OF UNDISPUTED FACTS

1.    In 2016, Plaintiff's son Torie Daniels was looking to rent an apartment at the Glen Park Apartments in Aurora Colorado ("Glen Park"), but his credit score was not high enough. Exhibit "B" at 7:17–5:9. So on or about January 14, 2017, Plaintiff signed a Lease Application at Glen Park for the benefit of his son Torie. *Id*. at 10:16–11:8; 12:22–24; Exhibit "A-3" at p. 1.

2.    The Lease was signed in Plaintiff's name on or about February 1, 2017, listing Plaintiff as the "resident" for a one-year term of February 1, 2017, to January 31, 2018. Exhibit "A-4" at ¶¶ 1, 3, and p. 7.

3.    Subsequently, Plaintiff's son Torie then began living at Glen Park with Plaintiff's knowledge, as Plaintiff would sometimes go to Glen Park to pick up Torie and take him to work. Exhibit "B" at 9:11–21.

4.    Plaintiff's son Torie Daniels lived at Glen Park from February 2017 to January 2019. Exhibit "A-5." When Torie Daniels vacated the apartment at Glen Park, a balance of was still due and owing on the Lease in the amount of $4,266.29 (the "Debt"). Exhibit "A-1" at p. 1.

### NCS Policies to Obtain Verifiable Lease Debts for Collection

5.      While also performing other collection related services, NCS is a third-party debt collector that collects debts from responsible parties that allegedly breached lease agreements. Exhibit "A" at ¶ 4. NCS has specialized in lease debt collection services for over thirty (30) years. *Id.* Pursuant to the policies and procedures developed by NCS over that thirty-year time period, NCS requires the original creditor, or its property manager, that hires NCS to collect its outstanding receivables, to either provide to NCS or have available for NCS's review, a signed lease by the responsible parties, a lease application with the responsible parties' contact and personal information to help identify and verify the responsible parties, and provide a final account statement or other similar document, such as a tenant ledger or move-out statement, that provides a description of the charges due under the lease that comprises the alleged principal amount of the debt. *Id.*  In addition, NCS's service agreements with its clients require the original creditor to represent that the debts provided to NCS for collection are accurate.  *Id.* The service agreements also include an indemnity provision, whereby, if the original creditor provides a debt to NCS for collection that is not accurate, the original creditor must indemnify NCS from any damages resulting from the inaccuracy. *Id.* Such policies incentivize NCS's clients to avoid placing inaccurate or unverifiable debts. *Id.* Between the documents that support these leasing debts (leases and account statements prepared by property managers familiar with the lease terms) and NCS's service agreement terms, NCS can reasonably rely on the accuracy of the debts placed for collection. *Id.*

### NCS' Policies Regarding Dispute Investigation

6.      It is NCS's policy to only provide accurate information to the CRAs.  *Id.* at ¶ 5, Further, it is NCS's policy to conduct a reasonable investigation when a dispute is received,

regardless of whether it is a direct dispute to NCS or indirect dispute received through ACDVs from the CRAs. *Id.* NCS trains its investigators, and in the case of contractors hired as specialists for investigations, such investigators receive separate training by their company, to perform reasonable investigations, including the use of NCS's written policies and procedures which are described below. *Id.*

7.      Indirect Disputes Received through ACDVs. For each dispute received by the CRAs from consumers, the CRA will review the consumer dispute received, determine the appropriate "dispute code" from a list of e-Oscar dispute codes, then submit the ACDV to NCS for response. *Id.* at ¶ 6. The dispute code selected by the CRA will necessarily determine what information and documents the dispute investigator will review or seek from the original creditor. If the consumer attaches relevant documents or information to support their dispute to the CRAs, then the CRAs when submitting the ACDVs will (typically) include a description of the dispute and/or images from the consumer's dispute that would assist the data furnisher, like NCS, with its investigation or establish why the consumer was disputing the subject account. *Id.* For a situation like the one presented in this Litigation where the Plaintiff alleges the debt results from identity theft, pursuant to its written policies and procedures to conduct a reasonable investigation of these indirect disputes received through ACDVs, NCS's administrative personnel and contractors that conduct the investigations, will review the following: (1) the dispute code which is used to guide the investigation, (2) the account notes for the subject debt which will include notes on the investigation of any previous disputes, communications between NCS and the debtor, and communications between NCS and the original creditor, (3) the documents in NCS's batch file for the subject debt such as the lease, final account statement, any tenant ledger and specifically, for claims of fraudulent activity, the lease application that will provide all of the identity and personal

information for the alleged debtor, (4) any reasons for the dispute as supplied by the ACDV, and (5) any documents provided by the alleged debtor included with the ACDV, as well as previous documents supplied by the alleged debtor to NCS, all of which are kept in NCS's batch file for the subject debt. *Id.* Based on NCS's thirty years of experience investigating leasing debt disputes, this process for investigating leasing debts has proven to be reasonable. *Id.*

8.   <u>Direct Disputes Received from the Alleged Debtor through ACDVs</u>. For a situation like the one presented in this Litigation where the Plaintiff alleges identity fraud, pursuant to its written policies and procedures to conduct a reasonable investigation of disputes made by the alleged debtor to NCS (referred to as "direct disputes" as opposed to the indirect disputes received from the CRAs through ACDVs), NCS uses its internal investigation team and reviews similar information and documents as the indirect dispute investigation process. *Id.* at ¶ 7. The direct dispute investigation process includes: (1) the account notes for the subject debt which will include notes on the investigation of any previous disputes, communications between NCS and the debtor, and communications between NCS and the original creditor, (2) the documents in NCS's batch file for the subject debt such as the lease, final account statement, and any tenant ledger and specifically for claims of fraudulent activity, the lease application that will provide all of the identity and personal information for the alleged debtor, (3) any reasons for the dispute as supplied by alleged debtor, and (4) any documents provided by the alleged debtor included with the dispute, as well as documents provided in any earlier disputes, all of which are kept in NCS's batch file for the subject debt and (5) may seek additional information, specifically answers to NCS's for "fraud packet," a signed and filed police report, and/or an executed identity theft affidavit. *Id.* In addition to those steps, and depending on the nature of the dispute, NCS may also communicate with the Original Creditor by email or telephone call, to alert the Original Creditor of the dispute, the reason

for the dispute, and to verify any allegation or identity of the debtor. *Id*.  For leasing debts, particularly as NCS actively collects those debts through regular mailing campaigns and telephone contact campaigns, the Account Notes will almost invariably include a direct dispute, just as it did with facts involved in this Litigation. *Id*.  As such, most indirect disputes will have direct dispute information and investigation results to use in the reasonable investigation of indirect disputes. *Id*.

9.      <u>Issue of Legal Disputes</u>.  For the situation involved in this Litigation, NCS does not, and is not required under the framework of the FCRA, to train its collectors, investigators, or contractors to attempt to resolve legal disputes, interpret lease provisions, or research state law. *Id*. at ¶ 8.  Specifically, in this instance with Plaintiff, NCS is not going to determine whether Plaintiff is liable on the lease debt when he signed the Lease Application. *Id*. Likewise, NCS is not going to make a legal determination (which became apparent in the Litigation) whether the Plaintiff is responsible for the subject lease debt when he allowed his son, Torie Daniels, to obtain the apartment using Plaintiff's personal and credit information in the Lease Application that was signed by Plaintiff. *Id*.  A dispute based on the legal issue whether Plaintiff is responsible after he authorized the use of his information for his son to occupy the apartment is not the type of factual inaccuracy that NCS can resolve through any FCRA reasonable investigation.  *Id*.

10.     Conversely, if the matter is not a legal determination of lease debt responsibility and the alleged debtor provides an identity theft affidavit or police report that sufficiently provides information indicating true identity theft, NCS, pursuant to FCRA § 1681s-2(a)(6), would request deletion of the account tradeline.  *Id*. at ¶ 9.

### NCS' Investigation of Plaintiff's Disputes

11.     All disputes received by NCS are noted and included on NCS's Account Demographics and Notes (the "Account Notes"). *Id*. at ¶ 10. All collectors, investigators, and

contractors performing investigations are trained regarding NCS's collection software, WinDebt, including how to notate all activity taken with respect to a particular account and debt, including the investigations of any direct or indirect disputes. *Id.* The Account Notes for Plaintiff's debt allegedly owed to PRCP-Aurora, LLC d/b/a Glen at the Park Apartments, managed by Priderock (the "Original Creditor") is attached here to as Exhibit "A-1" and detailed below. *Id.*

12.     Plaintiff's Indirect Dispute processed on May 6, 2019.  NCS processed an ACDV on or about May 6, 2019, where the CRA determined the dispute code as "104" ("claims account take over, fraudulent charges made on account") and was investigated by NCS pursuant to its policies and procedures set out above and described on the Account Notes attached as Exhibit "A-1" at p. 1. *Id.* at ¶ 11.  A copy of NCS's ACDV information for all ACDVs received is attached hereto as Exhibit "A-2."  The Account Notes ("A-1" at p. 1.) indicate that no documents, such as an identity theft report or police report were provided by Plaintiff, and the investigator reviewed the account for identity theft comparing the ACDV information with information on the Original Creditor's documents which included the Lease Application, Lease, and Move-Out Statement, true and correct copies of which are attached hereto as Exhibits "A-3," "A-4," and "A-5" respectively. *Id.*  As a result of that reasonable investigation, the investigator verified the debt as no documentation in the review indicated that the subject debt resulted from identity theft, particularly as the dispute did not include any evidence or documents in support of an identity theft claim.  *Id.*

13.     Plaintiff's Oral Direct Dispute on August 12, 2020.  This first direct dispute made by Plaintiff was made to NCS during a telephone conversation between Plaintiff and NCS on August 12, 2020.  *Id.* at ¶ 12; *see also* Exhibit "A-1" at pp. 1–2.  As a result of that direct dispute, the collector correctly confirmed the account was marked as disputed by the Plaintiff which then updates any data furnished to the CRAs to include that dispute (a code "XC" on the e-Oscar

system). Exhibit "A" at ¶ 12.  The collector also explained to Plaintiff exactly what he needed to

send to NCS to investigate an allegation of identity theft. *Id.*; *see also* Exhibit "A-1" at p. 1 (8/12/20

entry at 3:06 p.m.).  Pursuant to NCS's policies and procedure that would include a request for the

Plaintiff to provide a police report and/or identity theft affidavit. Exhibit "A" at ¶ 12.

14.   Plaintiff's Indirect Disputes processed on or about June 30, 2020, and August 25,

2020.  For these indirect disputes each with two dispute codes of "103" (claims true identity

fraud/account fraudulently opened, provide or confirm complete ID), despite NCS's instruction to

plaintiff to provide additional information/documents such as police report or identity theft

affidavit, nothing was provided. *Id.* at ¶ 13; *see also* Exhibit "A-1" at pp. 1–2 and Exhibit "A-2."

For each reasonable investigation, the Lease Application confirmed Plaintiff's identity and with

no other information provided in support of the claim, dictated that it was verified. Exhibit "A" at

¶ 13; *see also* Exhibits "A-1" at pp.1–2 and Exhibit "A-2" (Response codes "23" for "disputed

item accurate"), and Exhibit "A-3" (Lease Application information).

15.   Indirect dispute processed on February 7, 2022.  For this ACDV processed on or

about February 7, 2022, Plaintiff included a letter, Identity Theft Affidavit, and Police Report as

was recommended by NCS on August 12, 2020 and again in other telephone conversations with

Plaintiff on December 18, 2020 and August 9, 2021. Exhibit "A" at ¶ 14; *see also* Exhibit "A-1"

at pp. 1–3. The documents provided by Plaintiff are attached hereto as Exhibit "A-6." As indicated

in the Account Notes, the investigator reviewed the documents compared to the Original Creditor's

documents. Exhibit "A" at ¶ 14; *see also* Exhibit "A-1" at p. 3.  Such review confirmed that

Plaintiff was the party who filled out the Lease application—all of the personal identifiers were

the same, the contact information matched, the handwriting matched, and the signatures matched.

Exhibit "A" at ¶ 14; compare Exhibit "A-3" with Exhibit "A-6." As result of this reasonable

investigation, the debt was again verified using response code "23." Exhibit "A" at ¶ 14; *see also* Exhibit "A-1" at p. 3 an Exhibit "A-2."

16.     No allegation has been made that the amount of the subject debt is inaccurate as provided in Exhibit "A-5." *Id*. at ¶ 5. This is a valid debt, the only question is a legal one – whether Plaintiff providing his personal information in the Lease Application and signing it – makes him responsible for any resulting debt arising from the Lease.  *Id*.

## STANDARD OF REVIEW

Summary judgment is proper when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A dispute is "genuine" if the issue could be resolved in favor of either party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Farthing v. City of Shawnee*, 39 F.3d 1131, 1135 (10th Cir. 1994). A fact is "material" if it might reasonably affect the outcome of the case. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Farthing*, 39 F.3d at 1134.  A party who does not have the burden of proof at trial must show the absence of a genuine fact issue. *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994), *cert. denied*, 514 U.S. 1004, 115 S. Ct. 1315, 131 L. Ed. 2d 196 (1995). Once the motion has been properly supported, the burden shifts to the nonmovant to show, by tendering depositions, affidavits, and other competent evidence, that summary judgment is not proper. *Concrete Works*, 36 F.3d at 1518.

## ARGUMENT AND AUTHORITIES

I.   **The summary judgment evidence conclusively proves that Plaintiff was not the victim of identity theft, so his FCRA and FDCPA claims against NCS fail as a matter of law.**

The sole basis for Plaintiff's FCRA and FDCPA claims against NCS is that the Debt is not his, because he is a victim of identity theft.  But the summary judgment evidence conclusively proves that there was no identity theft. Therefore, his FCRA and FDCPA complaints fail as a matter of law.

Plaintiff subsequently testified in his deposition that:

- He signed the Lease Application to help his son Torie Daniels obtain an apartment with Glen Park because his son's credit score was otherwise too low;

- That he knew his son was, subsequently, living at Glen Park;

- That he intended to be liable on the Lease (but only for the first six months).

Exhibit "B" at pp. 7-12.

Based on his sworn deposition testimony, the sole basis for Plaintiff's claim that he does not owe the debt is not identity theft—it is that he only agreed to be liable for the first six months of his son's rent under the Lease as follow:

Q.   Okay. And if -- and if Torie's credit score wasn't high enough to get an apartment at the Glen at Park Apartments, did you help him do that?

A.   Yes, I signed for him, yeah.

Q.   So you signed a lease for Coy -- I mean, I'm sorry -- for Torie?

A.   Uh-huh.

Q.   Were you signing a lease that was then in -- in your name, Coy Daniels, or one in Torie Daniels' name?

A.   Torie's. That's what they said. They said I can sign and what it -- what it would do, they said within six months, Torie will be able to be on his own as far as taking occupancy of the apartment.

Exhibit "B" at 8:13–9:1.

> Q.   Okay. And is that on the signature line, is that your signature?
>
> A.   Yes, uh-huh.
>
> Q.   Did you have the intention to live at the Glen Park Apartments?
>
> A.   No, huh-uh. I was there, like I said earlier, just to -- because they said my son's score wasn't high enough and so that's what I done. I signed -- I signed for him to get into the apartment and they said that everything -- after six months, that he was able to be -- he would be there -- able to live there without my signature.

*Id*. at 12:22–13:8.

Plaintiff admitted under oath that he intended to be at least partially liable under the Lease. Therefore, necessarily, there was no identity theft. As identity theft is Plaintiffs' sole basis for NCS's alleged violations of the FCRA and FDCPA and there was no identify theft, Plaintiff's claims against NCS fail as a matter of law.  *See e.g.*, *Christian v. Equifax Info. Servs., LLC*, No. 18-13682, 2020 U.S. Dist. LEXIS 76725, at *13 (E.D. Mich. 2020) ("The undisputed evidence shows that there is no inaccuracy on Christian's credit report related to her Ginny's Account. Ginny's is entitled to judgment as a matter of law on Christian's claims for negligent and willful violation of the FCRA.").

## II.   The summary judgment evidence conclusively proves that there was no factual inaccuracy in the reported Debt and that NCS performed a reasonable investigation of the Debt; therefore, NCS did not violate the FCRA or FDCPA as a matter of law.

### A.   Fair Credit Reporting Act.

#### 1.   Plaintiff's Allegations

Daniels alleges that NCS violated the FCRA as follows:

68.   NCS violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to conduct an investigation with respect to the disputed information after receiving numerous requests for an investigation from Equifax and Plaintiff.

                                        \*     \*     \*

71.   NCS violated 15 U.S.C. §1681s-2(b)(1)(B) by failing to review all relevant information provided by Equifax and Plaintiff pursuant to §1681i(a)(2).

                                          \*     \*     \*

73.   NCS violated 15 U.S.C. § 1681s-2(b)(1)(C) by failing to report the results of any reasonable investigation or reinvestigation of Plaintiff's disputes to Equifax.

74.   NCS violated 15 U.S.C. § 1681s-2(b)(1)(C)-(D) by failing to report the results of its investigation or reinvestigation to Equifax after being put on notice and discovering inaccurate and misleading reporting with respect to the subject account.

75.   NCS violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to promptly modify, delete, or permanently block the inaccurate information on Plaintiff's credit file. Instead, NCS continued to report the inaccurate and misleading information in Plaintiff's credit file after Plaintiff's detailed disputes.

76.   NCS failed to conduct a reasonable reinvestigation of their reporting of the collection accounts, record that the information was disputed, or delete the inaccurate reporting from Plaintiff's credit file within 30 days of receiving notice of Plaintiff's multiple disputes from Equifax under 15 U.S.C. §1681i(a)(1).

77.   NCS violated 15 U.S.C. § 1681s-2(b)(2) by failing to take the required action with respect to Plaintiff by the deadlines set forth in 15 U.S.C. §1681i(a)(1).

78.   NCS violated 15 U.S.C. § 1681s-2(a)(6)(B) by furnishing the disputed information to Equifax after it received notice that Plaintiff is a victim of identity theft.

Doc. 1.

## 2.   Applicable Law

Congress enacted the FCRA "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Hunt v. JPMorgan Chase Bank, Nat'l Ass'n*, 770 F. App'x 452, 453 (11th Cir. 2019) (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52, 127 S. Ct. 2201, 167 L. Ed. 2d 1045 (2007)). The FCRA governs the conduct of CRAs, as well as furnishers, the entities that supply information to CRAs. *Id.* In this case, NCS is

a furnisher. The FCRA prohibits furnishers from "furnish[ing] any information relating to a consumer to any [CRA] if the person knows or has reasonable cause to believe that the information is inaccurate" or "if the person has been notified by the consumer . . . that specific information is inaccurate [and] the information is, in fact, inaccurate." 15 U.S.C. § 1681s-2(a)(1).

Upon notice that a consumer disputed the accuracy or completeness of information provided by a furnisher, the furnisher must conduct an investigation regarding the disputed information, review all relevant information provided by the CRA, and report the results of the investigation to the CRA. *Id*. § 1681s-2(b)(1). If the investigation reveals that the disputed information is incomplete, inaccurate, or cannot be verified after reinvestigation, the furnisher must either modify, delete, or permanently block reporting of that information. *Id*. For information determined to be inaccurate or incomplete, the furnisher must also report those results to all CRAs. *Id*.

A "reasonable" investigation "is one that a reasonably prudent person would undertake under the circumstances." *Maiteki v. Marten Transp. Ltd*., 828 F.3d 1272, 1275 (10th Cir. 2016) (quoting *Seamans v. Temple Univ*., 744 F.3d 853, 864 (3d Cir. 2014)). "[T]he reasonableness of the investigation is to be determined by an objective standard," and "[t]he burden of showing the investigation was unreasonable is on the plaintiff." *Maitek*, 828 F.3d at 1275 (quoting *Chiang v. Verizon New Eng., Inc*., 595 F.3d 26, 37 (1st Cir. 2010)). "Whether a defendant's investigation is reasonable is a factual question normally reserved for trial; however, summary judgment is proper if the reasonableness of the defendant's procedures is beyond question." *Maitek* at 1275 (quoting *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005)). Accordingly, circuit courts have affirmed summary judgments on § 1681s-2(b) claims in appropriate circumstances. *Id*. (citing *Chiang*, 595 F.3d at 38–39; *Westra*, 409 F.3d at 827; *Gorman v. Wolpoff & Abramson,*

*LLP*, 584 F.3d 1147, 1161 (9th Cir. 2009); *see also, Woods v. LVNV Funding, LLC*, 27 F.4th 544 (7th Cir. 2022).

Absent a showing of actual inaccuracy on a reinvestigation, a plaintiff's claim against a furnisher of information to a CRA fails as a matter of law. *See Chiang v. Verizon New Eng., Inc*., 595 F.3d 26, 37 (1st Cir. 2010). There must be some causal relationship between the CRA's allegedly unreasonable reinvestigation and the failure to discover inaccuracies in the account. *Id*.; *see also, Suluki v. Credit One Bank, NA*, 2023 U.S. Dist. LEXIS 55621, at *18 (S.D.N.Y. March 30, 2023) ("In other words, even if the *inaccuracy* of the reporting led to damages to the plaintiff, if there is 'no genuine issue of material fact as to whether a reasonable investigation would have revealed that [defendant] reported inaccurate information,' then there is no causal connection between the unreasonableness of the defendant's investigation and the inaccuracy that caused the plaintiff damages, and the plaintiff cannot prevail against that defendant.") (citation omitted). Plaintiffs suing furnishers under § 1681s-2(b) must make the same showing, for several reasons. *See Chiang v. Verizon New Eng., Inc*., 595 F.3d at 37.  Just as in suits against CRAs, a plaintiff's required showing is factual inaccuracy, rather than the existence of disputed legal questions. *Id*. at 38. Like CRAs, furnishers are "neither qualified nor obligated to resolve" matters that "turn[] on questions that can only be resolved by a court of law." *Id*.

"Generally, unresolved contract disputes constitute legal disputes that are not factual inaccuracies." *Belair v. Holiday Inn Club Vacations Inc*., No. 6:21-cv-165-WWB-DCI, 2022 U.S. Dist. LEXIS 235853, at *7–8 (M.D. Fla. 2022); *Holden v. Holiday Inn Club Vacations Inc*., No. 6:19-cv-2373-CEM-EJK, 2022 U.S. Dist. LEXIS 62830, at *7 (M.D. Fla. 2022) (citing *Batterman v. BR Carroll Glenridge, LLC*, 829 F. App'x 478, 481–82 (11th Cir. 2020)); *see also Wilson v. SunTrust Bank, Inc*., 533 F. Supp. 3d 1363, 1369 (S.D. Ga. 2021) (finding that the question of

whether the plaintiff was contractually obligated to make loan payments was one of legal interpretation and not factual accuracy); *Baldeosingh v. TransUnion, LLC*, No. 8:20-cv-925-WFJ-JSS, 2021 U.S. Dist. LEXIS 61726, 2021 WL 1215001, at *3 (M.D. Fla. March 31, 2021) ("A consumer fails to establish a factual inaccuracy . . . by merely asserting a challenge to the legal validity of a reported debt.").

The Eleventh Circuit has stated, in an unpublished opinion, that "[a] plaintiff must show a factual inaccuracy rather than the existence of disputed legal questions to bring suit against a furnisher under § 1681s-2(b)." *Hunt*, 770 F. App'x at 458 (citation omitted). Numerous courts have found that a furnisher's duty under the FCRA to investigate does not apply to legal disputes. *See, e.g., Holden*, 2022 U.S. Dist. LEXIS 62830, at *7 n.3 ("The Court finds *Hunt* far more persuasive than out-of-circuit case law."); *Jackson v. Bank of Am., N.A.*, No. 2:19-cv-01940-RDP, 2022 U.S. Dist. LEXIS 85075, 2022 WL 1493849, at *4 (N.D. Ala. May 11, 2022); *Kahalani v. Experian Info. Sols., Inc.*, No. 20-81018-CV, 2020 U.S. Dist. LEXIS 263897, 2020 WL 13388260, at *2–3 (S.D. Fla. Dec. 29, 2020); *Santessi v. Experian Info. Sols., Inc.*, No. 20-22689-CIV, 2020 U.S. Dist. LEXIS 198832, 2020 WL 13401919, at *2–3 (S.D. Fla. Oct. 26, 2020); *see also Wilson*, 533 F. Supp. 3d at 1369 ("[F]furnishers are neither qualified nor obligated to resolve issues that can only be resolved by a court of law."); *Bauer v. Target Corp.*, No. 8:12-cv-00978-AEP, 2013 U.S. Dist. LEXIS 201316, 2013 WL 12155951, at *13 (M.D. Fla. June 19, 2013) ("[A] furnisher's duty to investigate extends to factual inaccuracies, not legal disputes.").

*Chiang* is the leading case on the issue of whether an alleged legal dispute regarding the validity or enforceability of an underlying debt renders that debt "inaccurate" for purposes of a section 1681s-2(b) claim against a furnisher, which the Eleventh Circuit subsequently followed in

*Hunt*.[1] In addition, numerous courts have applied *Chiang* when addressing this issue. *See Holland v. Chase Bank United States, N.A.*, 475 F. Supp. 3d 272, 276 (S.D.N.Y. 2020) ("[h]ere, [plaintiff's] claim of 'factual inaccuracy' relies entirely on his legal contention that his debts had been discharged due to the purported running of the relevant state's statute of limitations[;] . . . [s]uch a dispute is a legal, not a factual, challenge, and . . . plainly insufficient to support [plaintiff's] FCRA claim [under section 1681s-2(b)]"), and elsewhere, *see, e.g., Garey v. BWW Law Grp., LLC*, 2021 U.S. Dist. LEXIS 190885, 2021 WL 4521329, *16–17 (D. Md. 2021) ("[t]he fact that [plaintiff] continues to dispute the legality of the [reported] foreclosure is of no object—[furnisher defendant] is neither qualified nor obligated to resolve a question that can only be resolved by a court of law") (citation and quotations omitted); *Garland v. Marine Credit Union*, 2018 U.S. Dist. LEXIS 183619, 2018 WL 5313769, *2, 4 (E.D. Wis. 2018) ("the dispute in this case is not over a factual inaccuracy in [d]efendants' reporting but rather a legal dispute regarding the impact the [state court amortization] proceeding had on [plaintiff's] debt overall[;] . . . [a]s a result, unless and until a proper tribunal concludes the [state court amortization] proceeding eliminated the debts in their entirety or that the plan precludes the accrual of post-filing interest and other penalties, [p]laintiff cannot establish that the reported information is factually inaccurate"); *Mehta v. Wells Fargo Bank, N.A.*, 2017 U.S. Dist. LEXIS 223523, 2017 WL 10573815, *3 (C.D. Cal. 2017) ("[plaintiff's] assertion—that [d]efendant's failure to perform all of its contractual obligations absolved [p]laintiff of her own duty to pay—is simply a contractual defense to the underlying debt [and]

---

[1] While *Chiang* has not been endorsed universally, *see, e.g., Denan v. Trans Union LLC*, 959 F.3d 290, 295 (7th Cir. 2020) (noting that because furnishers, unlike CRAs, "assume the risk and bear the loss of unpaid debt . . . they are in a better position to determine the legal validity of a debt"); *Thompson v. Transunion Data Sols., LLC*, 2021 U.S. Dist. LEXIS 91064, 2021 WL 1923409, *2 (N.D. Ill. 2021) ("[u]nlike [CRAs], furnishers must resolve legal questions regarding the liability when necessary to resolve disputed information"), it certainly appears to represent the prevailing view when courts deal with the type of claim asserted against furnishers like plaintiffs' here. *Mohnkern*, 2021 U.S. Dist. LEXIS 218532, at *15.

[t]he FCRA does not require [d]efendant [furnisher] to adjudicate [p]laintiff's legal contentions in the course of a credit investigation") (footnote omitted).

### 3. NCS conducted a reasonable investigation of the debt, and there was no factual inaccuracy.

When Plaintiff first disputed the Debt on May 6, 2019, to the CRAs, he did not provide any type of "identity theft report" under 15 U.S.C. § 1681s-2(a)(6)(B), rather it was only the dispute code provided by the CRA, without any supporting information. Certain identity theft provisions of the FCRA are only triggered when the dispute is accompanied by an identity theft report. *See* 15 U.S.C. § 1681c-2; *Adkins v. Sallie Mae Bank*, No. 22-cv-2082-JAR-RES, 2022 U.S. Dist. LEXIS 205313, at *17 n.39 (D. Kan. 2022) (citing *Brill v. TransUnion LLC*, 838 F.3d 919, 921 (7th Cir. 2016)).

Moreover, "what counts as a reasonable investigation depends on the content of the ACDV the furnisher receives." *Woods v. LVNV Funding, LLC*, 27 F.4th at 550; *see also, Forgues v. Select Portfolio Servicing, Inc.*, 690 Fed. Appx. 896, 904 (6th Cir. 2017) ("How thorough an investigation must be to be 'reasonable' turns on what relevant information was provided to a furnisher by the CRA giving notice of a dispute.") (*citing Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 616 (6th Cir. 2012)). Thus, when NCS reviewed the information provided by the CRAs, consisting of only a dispute code that triggered an identity theft review, and compared it to the information NCS had from the Original Creditor, there was nothing to indicate that Plaintiff was the victim of identity theft. 15 U.S.C. § 1681s-2(b)(1) imposes requires furnishers of information who receive notice of a consumer dispute from a CRA to: (1) investigate the disputed information; (2) *review all relevant information provided by the CRA*; (3) report the results of the investigation to the CRA; (4) report the results of the investigation to all other CRAs if the investigation reveals that the information is incomplete or inaccurate; and (5) modify, delete, or permanently block the reporting of the

disputed information if it is determined to be inaccurate, incomplete, or unverifiable. *Robbins v. Dyck O'Neal, Inc.*, 447 F. Supp. 3d 1100, 1105 (D. Kan. 2020) (citing *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1178–79 (10th Cir. 2013)).

Plaintiff's second dispute was on August 12, 2020, when he orally disputed the Debt directly to NCS by phone.  Note, as an oral dispute directly to NCS, this did not trigger any FCRA responsibilities, but such information in the Account Notes does assist and is used in the reasonable investigation of later indirect disputes.  *See* Exhibit "A" at ¶ 6.  As Plaintiff provided no additional information or documents at that time beyond what had been reviewed in response to Plaintiff's first dispute, NCS requested that Plaintiff provide some type of identity theft affidavit or police report to help further investigate the dispute.  *See* Exhibit "A" at ¶ 12; *see also* Exhibit "A-1" at pp. 1–2.  While Plaintiff did not provide any such report, it is proper for NCS to encourage debtors to provide information that will assist future investigations.  *See e.g.*, *Woods v. LVNV Funding, LLC*, 27 F.4th at 544 (7th Cir. 2022).

Plaintiff's third and fourth disputes, on June 30, 2020, and August 25, 2020, were indirect disputes to the CRAs triggering an FCRA investigation.  However, Plaintiff still had not provided any type of identity theft affidavit, police report or other documents beyond what was provided in his first dispute.  *See* Exhibit "A" at ¶ 13; *see also* Exhibit "A-1" at pp. 1–2.  In such a situation, NCS performs a reasonable investigation by reviewing the documents provided by the Original Creditor, including the Lease Application, to confirm Plaintiff's personal identifiers.  *See e.g.*, *Westra*, 409 F.3d at 827 (When an ACDV contained only scant information regarding the nature of the dispute that the account "did not belong" to the plaintiff, the court held that the furnisher's limited investigation, in which it "verified name, address, and date of birth," to be reasonable beyond question.).

On February 7, 2022, Plaintiff made his final dispute, an indirect dispute to the CRAs, and finally provided an identity theft and police report that NCS had requested from Plaintiff on three (3) different occasions.  *See* Exhibit "A" at ¶ 14; *see also* Exhibit "A-1" at pp. 1–3.  However, NCS continued to verify the account information because the reasonable investigation included a review of the police report and Lease Application which determined that the information being furnished to the CRAs was still correct.  *See* Exhibit "A" at ¶ 14; *see also* Exhibit "A-1" at p. 3. The handwriting, signature, and personal information on Plaintiff's Statement to the Denver Police Department matched the handwriting, signature, and personal information on the Lease Application used to obtain the Lease on which the Debt was based, and the Lease was in Plaintiff's name. *Id.*

At that point, the only issue regarding the Debt was the legal dispute of whether Plaintiff was liable under the Lease—despite his claim of identity theft—given that NCS's reasonable investigation showed that Plaintiff appeared to have filled out and signed the Lease Application for someone else to obtain the apartment, which NCS learned in this litigation, was his son. *See* Exhibit "A" at ¶ 14.

Moreover, Plaintiff subsequently testified in his deposition that confirmed the following:

- He signed the Lease Application to help his son Torie Daniels obtain an apartment with Glen Park because his son's credit score was otherwise too low;

- That he knew his son was, subsequently, living at Glen Park;

- That he intended to be liable on the Lease—just only for the first six months.

*See* Exhibit "B" at pp. 7–12.

All of which further undercuts his claim of alleged identity theft and underscores that the only issue was his legal liability under the Lease with Glen Park—a legal issue NCS could not

resolve by any investigation.

Thus, because Plaintiff's inaccuracy claim is inherently "tethered to a legal dispute" with Glen Park, it cannot form the basis of a violation under section 1681s-2(b). *See, e.g., Schuh v. American Express Bank, FSB*, 2018 U.S. Dist. LEXIS 75887, 2018 WL 3730897, *4 (S.D. Fla.), *report and recommendation adopted by*, 2018 U.S. Dist. LEXIS 75888, 2018 WL 3730226 (S.D. Fla. 2018), *aff'd*, 806 F. App'x 973 (11th Cir. 2020). Plaintiff's claim is based on a legal dispute that is not actionable under the FCRA and NCS is entitled to summary judgment. *Belair v. Holiday Inn Club Vacations Inc*., 2022 U.S. Dist. LEXIS 235853, at *11; *See Hunt* at 458; *see also Mayer*, No. 6:20-cv-2283; *Holden* at *3–4.

### B. Fair Debt Collection Practices Act

Daniels alleges that NCS violated the FDCPA as follows:

> 91. NCS violated §1692e, e(8), and e(10) when it continued to communicate false credit information to Equifax with regard to the subject account. Plaintiff repeatedly informed NCS that the accounts were the result of fraud, as he never had a relationship with the original creditor, Glen. In spite of the plethora of information and disputes provided to NCS proving that Plaintiff was not the correct debtor, NCS knowingly continued to verify the disputed information as accurate, knowing it would harm Plaintiff's credit standing.

*       *       *

> 93. NCS violated 15 U.S.C. §1692f when it unfairly attempted to collect upon the subject debt. Specifically, it was unfair for NCS to harm Plaintiff's credit reputation by continuing its collection efforts, including the wrongful reporting of the subject account to Equifax, when NCS was provided with a litany of information and disputes indicating that Plaintiff was not responsible for the underlying debt.

Doc. 1.

Plaintiff's' FDCPA claim relates to NCS's efforts to collect the debt and, as with their FCRA claim, similarly hinges on their contention that he does not owe the Debt based on his claim of identity theft.  To sustain a claim under the FDCPA, a plaintiff must show that "(1) she has been

the object of collection activity arising from consumer debt, (2) the defendant is a debt collector as defined by the FDCPA, and (3) the defendant has engaged in an act or omission prohibited by the FDCPA." *Ossipova v. Pioneer Credit Recovery, Inc*., 2019 U.S. Dist. LEXIS 214455, 2019 WL 6792318, *3 (S.D.N.Y. 2019) (citation omitted);.  Focusing only on the third element without conceding the first; Plaintiff alleges that NCS's attempt to collect the debt violated sections 1692e, 1692e(2)(A), 1692e(5), 1692e(8), 1692e(10), and 1692f(1) of the FDCPA. Doc. 1-2 at 10–11.

Section 1692e of the FDCPA prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Among other things, this section prohibits the "false representation of the character, amount, or legal status of any debt," 15 U.S.C. § 1692e(2)(A), the "threat to take any action that cannot legally be taken or that is not intended to be taken," 15 U.S.C. § 1692e(5), and the "use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer," 15 U.S.C. § 1692e(10). Moreover, the FDCPA precludes debt collectors from using "unfair or unconscionable means to collect or attempt to collect any debt," 15 U.S.C. § 1692f, which includes the "collection of any amount . . . unless such amount is expressly authorized by the agreement creating the debt or permitted by law," *id*. at § 1692f(1). Whether a communication violates the FDCPA is evaluated under the "least sophisticated consumer" standard, which is an "objective standard, designed to protect all consumers, the gullible as well as the shrewd." *Huebner v. Midland Credit Mgmt., Inc*., 897 F.3d 42, 51 (2d Cir. 2018) (citation and quotations omitted), *cert. denied*, 139 S. Ct. 1282, 203 L. Ed. 2d 280 (2019).

As with Plaintiff's FCRA claim, Plaintiff's dispute of the debt was unrelated to any factual inaccuracy regarding the Debt. Rather his dispute was based solely on a claim of identity theft. These claims fail because the summary judgment evidence conclusively proves that NCS did not

use any misrepresentations or deceptive means to collect the debt. "[T]he FDCPA is concerned with unlawful debt collection practices, not mere disputes over the legality of the underlying debts." *Chambers*, 68 F. App'x at 715 (no FDCPA claim where plaintiff's complaint "ma[de] clear that the real issue is whether she [was] liable [for the debt at issue], not whether the defendants engaged in unlawful collection practices"), *cert. denied*, 540 U.S. 1119, 124 S. Ct. 1064, 157 L. Ed. 2d 913 (2004). Even if the Court considered an argument that Plaintiff presented a legal question as to the construction and interpretation of the Lease to determine whether he is liable under the Lease, there would not be a violation of the FDCPA. *See e.g., Ducrest v. Alco Collections, Inc*., 931 F. Supp. 459, 462 (M.D. La 1996) (The FDCPA "does not require an independent investigation of the information provided by clients when a debt collector tries to collect a debt, nor does it require the debt collector to dispute the creditor's construction of a contract.").

## PRAYER

WHEREFORE, Defendant National Credit Systems, Inc. respectfully request that the Court (1) grant summary judgment in favor of NCS as a matter of law on all of Plaintiff's claims, (2) reserve the right for NCS to seek relief pursuant to FDCPA § 1692k(a)(3); (3) dismiss Plaintiff's claims with prejudice and with costs taxed against Plaintiff, and (4) for such other relief to which NCS may be justly entitled.

Respectfully submitted,


By: _____*s/John W. Bowdich*_____
        JOHN W. BOWDICH
        State Bar No. 00796233

BOWDICH & ASSOCIATES, PLLC
8150 N. Central Expy., Suite 500
Dallas, Texas 75206
(214) 307-9500 – Telephone
(214) 307-5137 – Telecopy
jbowdich@bowdichlaw.com

ATTORNEYS FOR DEFENDANT
NATIONAL CREDIT SYSTEMS, INC.


## CERTIFICATE OF SERVICE

On May 3, 2023, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, District of Colorado using the electronic case filing system of the court, thereby providing service to all parties.

Nathan C. Volheim, Esq.                VIA ECF
SULAIMAN LAW GROUP, LTD.
2500 South Highland Ave., Suite 200
Lombard, Illinois 60148
*ATTORNEY FOR PLAINTIFF*


By: _____*s/John W. Bowdich*_____
        JOHN W. BOWDICH